Amended

| | |
|---|---|
| STEVEN WILLIAMS<br><br>**Plaintiff**,<br><br>vs.<br><br>ROSENBLATT SECURITIES<br>  RICHARD ROSENBLATT<br>  JOSEPH GAWRONSKI<br>  GARY WISHNOW<br>  ALEX KESSMSIES<br>  JUSTIN SCHACK<br>  SCOTT BURILL<br>  GORDAN CHARLOP<br>  CHARLES RONEY<br>DR. LORAINE HENRICKS (TURANSKI0<br>NEW YORK STOCK EXCHANGE (NYSE)<br>JANE ST. CAPITAL<br>INTIGRAL DERIVATIVES<br><br>**Defendant** | **COMPLAINT**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY**<br><br>14cv 4390<br><br> |

**Plaintiff Steven Williams, Pro Se, alleges and avers follows:**

## NATURE OF THE CASE

1. Steven Williams was the Chief Derivatives & ETP Strategist with Rosenblatt Securities Inc. from January 15, 2012 to October 12, 2012. Mr. William's 15-year career as a derivatives and Exchange-Traded-Products (ETP) trader, portfolio manager, and strategist ended in ruin when he was fired from Rosenblatt Securities Inc. for having protested months of unlawful and unrelenting retaliatory harassment on October 12, 2012.

2. Mr. Williams reported details related to alleged illegal activity to the Securities and Exchange Commission (SEC), a senior advisor to a US Senator, a member of the US Congress, the United States Congress, and

the Senate Subcommittee on Securities, Insurance and Investments, the Secretary for the Commonwealth of Massachusetts, and the financial news media on April 13, 2012. This action placed Mr. Williams is in a protected class, awarding him protections in accordance to the anti-retaliation provisions afforded by Section 21F(h)(1) of the Exchange Act (15 U.S.C. 78u–6(h)(1)(iii).

3. Mr. Williams had previously reported Jane St. Capital of engaging in ongoing and possibly illegal activities to a senior advisor of a US Senator on October 27, 2011. Mr. Williams disclosed this to senior management at Rosenblatt Securities Inc. when they offered him the position of Chief Derivatives & ETP Strategist in December, 2011. Rather than rescind its offer or disclose its relationship with Jane St. Capital, Rosenblatt Securities Inc. chose to embark upon a morbid and perverse campaign of retaliation. Mr. Williams was unaware that Rosenblatt Securities Inc. derives up to 80% of its annual revenues facilitating High-Frequency-Trading (HFT) for Jane St. Capital after speaking with two independent recognized experts on Market Structure and HFT in May, 2014

4. The alleged violations of Mr. Williams reported on April 13, 2012 strongly resembled the ongoing and possibly illegally involving Jane St. Capital that he discussed with a senior advisor to an influential US Senator in October, 2011. Mr. Williams alleges that Rosenblatt Securities Inc., intent upon protecting its franchise engaged in a concerted effort to intentionally induced an extreme and overwhelming sense of anxiety to discredit and permanently drive him from Wall St.. His personal and professional reputations shattered, physical and emotional health damaged, and amid reprisals of blacklisting, financial ruin, and fabricated allegations of paranoia and mental illness, Mr. Williams brings this complaint under Section 922of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 78U-6(h) *et seq.* "the Dodd-Frank act" for the defendant's unlawful retaliation.

## JURISDICTION MATTER

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C 1331 based upon the plaintiff's under 922 of the Dodd-Frank act.
6. The venue is proper in the Southern District of New York pursuant to 28 USC 1391 (a) because Rosenblatt Securities Inc., Jane St. Capital, Integral Derivatives, the New York Stock Exchange (NYSE), Mr. Wishnow, and Dr. Henricks are residents of New York and a substantial part of the events or omissions giving rise to these claims occurred in New York.

# PARTIES

### Plaintiff

7. Mr. Williams resides in New York, NY

8. Mr. Williams began working for the defendant, Rosenblatt Securities Inc. on January 15, 2012 as Chief Derivatives & ETP Strategist. Mr. Williams responsibilities were to produce research and strategy reports related to listed options and Exchange-Traded-Products (ETPs).

9. Mr. Williams reported what he reasonably believed to be illegal activities to the Securities and Exchange Commission (SEC), the United States Congress, and the Senate Subcommittee on Securities, Insurance and Investments, the Secretary for the Commonwealth of Massachusetts, and through the financial media. Mr. Williams had previously been engaged in calling attention possible violations of securities laws related to Exchange-Traded-Products (ETPs) beginning 2009.

### Defendants

10. Rosenblatt Securities Inc. is a New York Stock Exchange (NYSE) member firm that does business in and is located in the county and city of New York. Rosenblatt Securities Inc., 20 Broad St. 26th floor, New York, NY 10005, (212) 617-3100

11. Richard Rosenblatt is the founder and CEO of Rosenblatt Securities Inc.

12. Joseph Gawronski is the President and COO of Rosenblatt Securities Inc.

13. Gary Wishnow is a Managing Director with Rosenblatt Securities Inc.

14. Mr. Kessmsies is an Associate with Rosenblatt Securities Inc.

15. Justin Schack is a Managing Director with Rosenblatt Securities Inc.

16. Scott Burill is a Managing Director with Rosenblatt Securities Inc.

17. Joseph Bamanti is a Managing Director with Rosenblatt Securities Inc.

18. Gordan Charlop is a Managing Director with Rosenblatt Securities Inc.

19. Charles Roney is a Managing Director with Rosenblatt Securities Inc.

20. Dr. Loraine Henricks does business in and lives in the county and city of New York.

21. The New York Stock Exchange (NYSE) does business in and is located in the county and city of New York.

22. Jane St. Capital is a High-Frequency-Trading (HFT) firm that does business in and is located in the county and city of New York.

23. Integral Derivatives is an options market making firm that does business in and is located in the county and city of New York.

## FACTUAL ALLOGATIONS

**Mr. Williams engages in a protected activity.**

24. Mr. Williams engaged in a protected activity on April 13, 2012, when he reported details of an alleged violation of securities laws to the SEC, the United States Congress, and the Senate Subcommittee on Securities, Insurance and Investments, the Secretary for the Commonwealth of Massachusetts, and the financial media. This action awards Mr. Williams protections in accordance to the anti-retaliation provisions afforded by Section 21F(h)(1) of the Exchange Act (15 U.S.C. 78u–6(h)(1)(iii).

25. Details of his report were featured in Barron's on April 16, 2012. On that same day, Mr. Schack of Rosenblatt Securities Inc. emailed the plaintiff, "It's possible your piece piqued (or further piqued) the interest of regulators. I don't know if Alex told you, but two people from the SEC not on our regular distribution list requested viewership shortly after it went out."

**Rosenblatt Securities Inc. retaliates.**

26. Prior to his employment with Rosenblatt Securities Inc., Mr. Williams reported Jane St. Capital for engaging in an ongoing alleged financial fraud in the Exchange-Traded-Products (ETPs) to a senior advisor to a US Senator and the United States Congress and Senate Subcommittee on Securities, Insurance and Investments on October 27, 2012.

27. Mr. Williams was offered the position of Chief Derivatives & ETP Strategist with Rosenblatt Securities Inc. in December, 2011. Upon accepting their offer, the plaintiff disclosed that he'd "blown the whistle" on Jane St. Capital to defendants CEO Richard Rosenblatt, COO Joe Gawronski, and Managing Director Gary Wishow. The defendants chose not to rescind their offer or disclose their relationship with Jane St. Capital to Mr. Williams. The plaintiff learned from two independent sources, recognized experts on Market Structure, that Rosenblatt Securities Inc. derives up to 80% of its revenues facilitating High-Frequency-Trading (HFT) until May, 2014.

28. Rosenblatt Securities Inc. withheld access to the firm's data-visualization team and information regarding types of accounts the plaintiff's research should target and unduly micromanaged the plaintiff beginning in February, 2012. Mr. Williams was subsequently forced to work 12 to 14 hour day, often six days a week. Mr. Williams complained to his immediate supervisor and close friend of several years, Gary Wishnow, who was unwilling or unable to provide a solution.

29. The defendants hired Brian Reynolds as a Macro Strategist in March, 2014. Mr. Williams's work had to be edited and approved upon by two partners before it could be sent to compliance and approved for publishing. Mr. Williams and Mr. Reynolds's were alike in both title and seniority, only Mr. Reynolds's work didn't require a lot of data and he was free to publish his work without having it preapproved. Mr. Williams complained of the disparate treatment, first to his immediate supervisor Gary Wishnow, and later to his immediate supervisor's immediate supervisor, Mr. Gawronski. Despite Mr. Williams incessant complaining of being forced to work 12 to 14 hours a day, often six days a week, neither was willing to address his concerns.

30. During one such meeting, Mr. Gawronski said to the plaintiff, "My wife said something interesting last night. I checked up on Gary, but I never checked on you.". The plaintiff asked Mr. Gawronski to elaborate, but he quickly changed the subject.

31. In April, 2012, Mr. Williams fought and forced a report through the editing and approval process that outlined details of a recent $344mm alleged financial fraud that was similar to the alleged ongoing financial fraud involving Jane St. Capital that he'd reported in October, 2011. The plaintiff immediately called the Securities and Exchange Commission (SEC), and emailed the United States Congress, and the Senate Subcommittee on Securities, Insurance and Investments, the Secretary for the Commonwealth of Massachusetts, and forwarded a copy to a reporter from Barron's. On April 16, 2012, April 13, 2012, Defendant Justin Schack emails plaintiff saying, *"It's possible that your piece even piqued (or further piqued) the interest of the regulators. I don't know if Alex told you, but two people from the SEC not on our regular distribution list requested permission to view our report shortly after it went out."* In the body was a link to a Reuters article beginning, " U.S. regulators examining whether the exchange-traded note

market is harming investors have another reason to be concerned -- the sellers of these products are helping traders bet against them, sometimes at the expense of retail investors."

32. Later that day, Mr. Rosenblatt calls plaintiff reprimanded the plaintiff, "*It's not our job to police the markets*". Soon after, Mr. Williams's report is featured in Barron's. The following day, Mr. Gawronski and Mr. Schack independently asked the plaintiff how Barron's came into possession of his report.

33. The plaintiff's was forced to work 12 to 14 hour days, often six days a week beginning in February. Mr. Williams is accustomed to working long hours, and his work environment started to become unbearable in the latter part of March, 2012, right around the time the alleged financial fraud he reported on April 13, 2012 occurred. Having given up on the firm providing essential and available resources, the plaintiff attempted to automate the process of incorporating data into his reports with the help of Mr. Wishnow and without the knowledge of senior Management.

34. In March, 2012, Mr. Rosenblatt asked the plaintiff about his ADD five times in one week. The plaintiff and Mr. Wishnow began to argue incessantly soon after. By April, the plaintiff had been working 12 to 14 hours a day, six to seven days a week, for four months. Mr. Wishnow took over the task of incorporating data exclusively, but was unable to make it work.

35. The plaintiff had been, and continued to openly discuss Jane St. Capital's ongoing potential illegal activities with senior management until May, 2012. On May 15, 2012, a reporter from the Wall St. Journal emailed Mr. Williams for his opinion on a recent "suspect" trade in the ETP market, and the conversation soon shifted to the alleged ongoing financial fraud mentioned above. The plaintiff suggested the Wall St. Journal do a segment on ETP market makers, and the journalist replied, "*Yeah, a 'who is Jane St.' story would be great. I once approached one of their guys at a conference and when I identified myself as a reporter he looked at me like I had the plague. (He) couldn't get away from me fast enough... Need to ponder this... Interesting*".

36. On May 17, 2012, Mr. Gawronski and Mr. Burill, both partners with Rosenblatt Securities, emailed the plaintiff asking if he believed Jane St. Capital was involved in a similar "suspect" trade, and the plaintiff indicated "yes".. On May 20, 2012, the plaintiff was CC'd on several emails exchanged between Mr. Wishnow and senior management. It was suggested that Wishnow speak with Jane St. Capital about having them provide liquidity for ETF and single-stock-options. Mr. Gawronski, a former securities attorney, stated in one such email, "to be clear, we have a deep relationship", and another partner replied that he'd introduce Dan Macklowitz and Hector Guardinez of Jane St. Capital to Gary, adding, *"Dan can explain the relationship between the two firms"*. The plaintiff doesn't know what was discussed and never heard mention of Jane St. Capital again, but he knew he wasn't in a position to quit having just publically reported an alleged illegal activity and to stop talking about Jane St. Capital.

37. The plaintiff was soon pulled from an important project without warning or explanation. Mr. Schack, a former financial journalist who's opinion the plaintiff valued, stopped working with him on his derivatives work soon after. Not long after, Mr. Rosenblatt suggested the plaintiff move off the trading floor and into an office. Mr. Wishnow and the plaintiff's arguing grew in intensity and had spilled onto the trading foor, so the plaintiff soon heeded Mr. Rosenblatt's advice. Mr. Wishnow and a colleague, Mr. Amegaza began to "gang up" on the plaintiff. Literally and figuratively isolated, the plaintiff threatens to resign several times before going over his head to Mr. Gawronski on June 18, 2012 and demanding a change in supervisors and a solution to incorporate data into his reports.

38. Mr. Gawronski attempted to get the defendant to return to the same arrangement. The plaintiff, despite not being in a position to quit refused, and told Mr. Gawronski the environment was unhealthy and had taken a significant toll on his emotional and physical wellbeing, adding, "Don't take me back should I come begging for my job in two weeks.". After about two weeks of intense debate, it was decided that the plaintiff would report directly to Mr. Gawronski and that Mr. Kessmsies would be his support person.

39. Mr. Kessmsies met with Mr. Rosenblatt, Mr. Wishnow, and Mr. Gawronski on June 25, 2012. Mr. Kessmsies asked Mr. Williams Kara Stein, the senior advisor to the US Senator he'd spoken with regarding possible illegal activities involving Jane St. Capital in October, 2011.

40. Twenty minutes later, Mr. Williams met with Mr. Rosenblatt to discuss the new arrangement. During this meeting, Mr. Rosenblatt informed the plaintiff that Mr. Wishnow would have to sign off on his work and that he had to see a psychiatrist as a condition of his continued employment. The plaintiff protested, but wasn't in a position to quit and acquiesced.

41. Soon after, the plaintiff prompts Mr. Gawronski to give Mr. Kessmsies, whom he liked very much, a raise for the additional work that would be required of him going forward. Mr. Kessmsies, a philosophy major in college, gave the plaintiff a copy of "Meditations" by Marcus Aurelius to thank him, adding, *"Book XII is my favorite"*.

    From book XII, *"To holiness, in accepting willingly whatsoever is sent by the Divine Providence, as being that which the nature of the universe hath appointed unto thee, which also hath appointed thee for that, whatsoever it be. To righteousness, in speaking the truth freely, and without ambiguity; and in doing all things justly and discreetly. Now in this good course, let not other men's either wickedness, or opinion, or voice hinder thee: no, nor the sense of this thy pampered mass of flesh: for let that which suffers, look to itself."*

42. Defendants proceeded to intentionally induce a severe anxiety disorder into the plaintiff using "gas-lighting techniques"(Gas-lighting is a type of psychological and emotional abuse that insidiously induces a severe and overwhelming sense of anxiety in the target, and make him look and feel as if he's mentally unstable). Specifically, the defendants fostered an environment of unpredictability by "changed the rules in the middle of the game" staging surprise meetings and changing the outcome later, provided conflicting information and feedback and failed to honor agreements, placing him in "no-win situations" or setting him up to fail.

    42.1. Mr. Kessmsies sabotaged the plaintiff's work, first by using erroneous data and later by changing titles and dates and eventually removing or changing entire paragraphs in the plaintiff's reports. Mr. Wishnow, Mr. Gawronski, and Mr. Rosenblatt provided conflicting information as to what type of

research they wanted and/or called surprise research meetings, and agreeing to one thing and changing the outcome immediately after.

42.2. Mr. Gawronski and Mr. Rosenblatt used shaming, discounting, minimizing, trivializing, criticizing, and blaming techniques when the plaintiff complained of constant and unrelenting harassment, abuse, and humiliation. Mr. Gawronski accused the plaintiff of being "dramatic" or exaggerating the events, and Mr. Rosenblatt asked, "Why do you blow yourself up?. Neither investigated the plaintiff's complaints.

42.3. The plaintiff, not in a position to quit, told Mr. Gawronski that he'd have to fire him, and that he'll gain control of his research or die before he'll quit, hoping he could "shame" the defendants into doing the right thing.

42.4. Fully aware that the plaintiff couldn't quit, the defendants harassed and humiliated him up to 20 hours a day for 67 consecutive days before the plaintiff had a full blown stress-induced breakdown trying to "beat" the defendants. The plaintiff followed proper professional protocol, following the chain of command and reporting unlawful and humiliating harassment and intimidation pretty much every single day beginning in July 2012 until well after his employment had ended. The defendants did not investigate, address, or discipline anybody for the unlawful and obscene activity.

   42.4.1. In the first week of July, the plaintiff put together a detailed outline for reports and a tight schedule for everybody to adhere to. Mr. Kessmsies was to email the plaintiff data by 10:00 am on Saturdays, so he write his analyses and forward a completed draft to Mr. Gawronski, to edit and approve so the report could be published before the open on the following Monday, and everybody agreed. And put together a similar plan every week following, and everybody agreed. Not a single report was published on time, if at all. Most of this is in email.

   42.4.2. July 7, 2012, Mr. Kessmsies used erroneous data, and no report is published.

   42.4.3. July 14, 2012, Mr. Kessmsies used erroneous data and no report is published. Plaintiff complained to Mr. Gawronski. Mr. Gawronski told plaintiff Mr. Kessmsies had just gotten a raise and the plaintiff should take care of it.

   42.4.4. July 19, 2012 Mr. Wishnow hadn't given the plaintiff clarity on types of reports would be satisfactory. The plaintiff put together an example of what he would've liked to publish and sent it to sales marked "internal use only". Mr. Amegaza replied unprofessionally attacking the plaintiff and his work, CC'ing senior management. Mr. Wishnow laughed. The Plaintiff responded professionally to Mr. Amegaza and promptly emailed Mr. Gawrosnki and asked him to speak with both Mr. Wishnow and Mr. Amegaza. Mr. Gawrosnski said he would, but didn't follow through. Plaintiff said he was going to just remove Mr. Amegaza from his distribution list, and Mr. Gawronski wouldn't permit it.

   42.4.5. Soon after, Mr. Rosenblatt tells the plaintiff that specific recommendations aren't appropriate.

42.4.6. On July 20, 2012, the plaintiff sent an email showing how the trades performed. Mr. Rosenblatt responded positively saying, "I hope we made a lot of calls". The exact opposite of what he'd said the previous day. .

42.4.7. July 21, 2012, Mr. Kessmsies used erroneous data and forwarded it to the plaintiff several hours past the agreed upon time. Plaintiff complained to Mr. Gawronski. Mr. Gawronski does nothing.

42.4.8. Soon after, plaintiff asked Mr. Rosenblatt to speak with Mr. Wishnow and Amegaza. Mr. Rosenblatt said, "Can't you see he's standing up for his friend", and doesn't speak with Mr. Wishnow or Mr. Amegeza.

42.4.9. Soon after, Mr. Gawronski called an unplanned meeting. Mr. Gawronski, Mr. Wishnow and Mr. Kessmsies proceeded to change the agreed upon report structure. Plaintiff complained to Mr. Gawronski. Mr. Gawronski tells the plaintiff he has to work with Mr. Wishnow, and that he "won't let this get bogged down".

42.4.10. July 28, 2012, Mr. Kessmsies sent the plaintiff erroneous data several hours beyond the agreed upon time. The plaintiff complained to Mr. Gawronski, and is told he's being dramatic. Plaintiff informed Mr. Kessmsies that he's going to implement the data himself going forward. .

42.4.11. That week, Mr. Gawronski called a surprise meeting. He, Mr. Wishnow, and Mr. Kessmsies changed the structure of the report, and Mr. Kessmsies agreed to send the data to plaintiff. By 10:00 am on Saturday. Plaintiff reminded Mr. Gawronski that he won't quit, and that he was going to have to fire him.

42.4.12. August 5, 2012, Mr. Kessmsies sent erroneous data 19 hours late. Plaintiff had now worked 14 to 18 hours for 17 consecutive days.

42.4.13. That Tuesday, Mr. Gawronski called a surprise meeting and the structure of the report.

42.4.14. That Wednesday, Mr. Rosenblatt calls a meeting and changes the structure of the report again. Without explanation or details on what they Mr. Wishnow wanted, it's decided that the plaintiff was going to produce a data heavy daily report, two data heavy weekly reports, and a data heavy monthly reports, or 368 annually (1.46 data heavy reports per-day - 252 trading days in a year). For a frame of reference, the macro strategist produced no more than 252 reports annually without editing and with little to know data.

42.4.15. August 11, 2012, Mr. Kessmsies sent erroneous data around 21 hours late. Plaintiff complained to Mr. Gawronski, and it told he's being dramatic. Plaintiff has now worked 14+ hour days for 41 consecutive days.

42.4.16. August 14, 2012. Plaintiff emails Gawronski, Rosenblatt, and Wishnow after Kessmsies sends erroneous data 7 hours after the agreed upon time, quoting Einstein's definition of Insanity, "Doing the same thing over and over again and expecting different results.". Mt

Gawronski tells the plaintiff that he doesn't want anymore drama on the weekend, and Mr. Rosenblatt asked the plaintiff, "Why do you blow yourself up, Steve?"

42.4.17. August 19, 2012, Mr. Kessmsies sent erroneous data 19 hours late. Plaintiff has now worked 29 consecutive days for more than 14 hours.

42.4.18. Around this time, the plaintiff is stopped going through security and pulls his pockets inside out in frustration. Security guard called Rosenblatt Securities Inc.

42.4.19. August 29, 2012 Plaintiff emails Gawronski, Wishnow, and Kessmsies, *"The irony being that this weekend seemed a lot like last - and the one before that, and the one before that, and the one before that, and the... ."*. Gawronski replies, *The plan makes sense from both a big picture and process perspective to me— one tweak is I'd like to see the Alex data as well— I can't review with the same eye as Gary can, but I still think on occasion.",* and *"...feel like we're making progress here boys.* In response to the plaintiff's insistence that Mr. Wishnow and Mr. Kessmsies have no influence or power over his work.

42.4.20. September 7, 2012 Mr. Kessmsies sent the right data.

42.4.21. September 8, 2012 Mr. Kessmsies changed the data and title of the plaintiff's report. Plaintiff has now worked 50 straight days, and is now working up to 20 hours a day.

*42.4.22.* September 15, 2012, Plaintiff emails Gawronski in reference to Kessmsies's ongoing sabotage of his work, saying, *" Please help me control the chaos. Help me to take and keep control of my product. No additions or subtractions by anybody but me. I'm the research guy, help me be just that.".* Gawronski replies, *"You know I'm a supporter".* Nothing is done to stop the illegal retaliatory harassment.

42.4.23. September 17, 2012 Plaintiff emails Mr. Gawronski regarding Mr. Kessmsies sabotaging his work. Mr. Gawronski is unavailable

42.4.24. September 19, 2012 Plaintiff emails Mr. Gawronski regarding Mr. Kessmsies sabotaging his work. Mr. Gawronski is unavailable

42.4.25. September 21, 2012 Plaintiff yells at Mr. Kessmsies for sabotaging his work.

42.4.26. September 24, 2012 Plaintiff emails Mr. Gawronski and Mr. Rosenblatt saying informing them that he can't stop shaking and isn't going to come into work that day.

42.4.27. September 25, 2012, Mr. Kessmsies and Mr. Gawronski continue to harass the plaintiff after until after 12:00 the day after the plaintiff had a breakdown.. Plaintiff emails Kessmsies and Gawronski, *"We talked again on Friday about my needing to take control – do what I was hired to do...but you're not to do ANYTHING... but you have to help me or you're working against me. We have a product going out, but it's awfully expensive...IT'S GOTTA STOP"*

42.4.28. Plaintiff sends an email saying that he had an appointment with Dr. Henricks and either one of them is welcome to join him so they can work on communicating better. Mr. Rosenblatt says, "that's a good idea" and meets him there.

43. Dr. Henricks and Mr. Rosenblatt tell the plaintiff that he's mentally unstable for an hour and a half and try and convince him to take unwarranted medication. The plaintiff doesn't' entertain it and compares his work environment to "Lord of the Flies" and wants ask Mr. Rosenblatt to investigate.

44. September 26, 2012, the, plaintiff emailed Mr. Gawronski to remind Mr. Wishnow and Mr. Kessmsies that they aren't allowed to talk about his breakdown and says he wants to resign in protest. Mr. Gawronski replied, *"We have to be careful how we characterize this as we'll also want to make sure you are eligible to collect unemployment-- I think we can fairly say "eliminated position" given the option desk woes and pay cuts and that achieves both purposes-- we can discuss"*. October 2nd, plaintiff emails Mr. Gawronski, "Let's discuss my U4 too please. It's really - really important that I at least know what it says. Mr. Gawronski continues to pressure plaintiff into accepting position eliminated. On October 3' 2012, the plaintiff emails Mr. Gawronski, *"I need clarification on my U5 please."*. Mr. Gawronski, *"I'm happy to let you resign, but I think that's a big mistake for two reasons…* On October 10tth Mr. Gawronski emails the plaintiff, *" Hey, quick thing—on below planning to check "Other" and then explain that the position was terminated,* Exhausted, the plaintiff replied *"I can't weigh in on the other. I'm sorry, but it's your call."*. On January 2, 2013 the plaintiff is still asking for an exit interview," *Lets schedule an exit interview so I can see how my u5 was marked and what so I can be clear what to say should I ever be able to secure an interview."* Mr. Gawronski, *Yes, and I have apologized, but you insist on beating me up about this repeatedly… and then I spend time to try to sort a response that can help you reach out to potential employers and your respond like a "dick"-- your response to my email should have been "Thanks, that should work"*. Plaintiff is never granted an exit interview. Mr. Rooney, compliance officer of Rosenblatt Securities Inc., emailed him a copy of his U5 on January 5, 2013.

45. The plaintiff resigned "in protest" to the three months of unrelenting harassment, intimidation, and humiliation. The defendants refused to investigate his allegations, denying anything had occurred. In one email exchange, the plaintiff reminds Mr. Gawronski that Mr. Kessmsies never once did as he'd been instructed. Mr. Gawronski replied that Mr. Kessmsies was a "supporter", and didn't do as instructed on time because it, "was the weekend".

46. The plaintiff replied, "I guess you're HR too". To the best of his knowledge, Rosenblatt Securities Inc. has no Human Resources department.

47. Soon after, the plaintiff emailed Mr. Gawronski informing him that his U5, Mr. Wishnow's lack of discretion, and the fact he was physically unable to fill out his unemployment forms as a result of his traumatic experience were "problems"

48. Mr. Rosenblatt emailed plaintiff on October 2, 2012 saying he had an appointment with Dr. Henricks, and asked if he'd join him. Mr. Rosenblatt and Dr. Henricks pressured the plaintiff to take unwarranted medication for two-hours. The plaintiff refused and asked him to "*find his 15lbs.*" in reference to his massive weight loss. Mr. Rosenblatt, Dr. Henricks, and Mr. Gawronski pressured the plaintiff for two weeks, and finally bribed the plaintiff with three months of COBRA and a possible consulting position from the plaintiff's home. Plaintiff agreed on October 18, 2012, but admits to not taking the unwarranted medication.

49. Dr. Henricks promptly ceased all communication with the plaintiff.
    49.1. Dr. Henricks had previously referred the plaintiff to a Dr. Nandahar, a good friend of here who takes insurance. Dr. Nandahar never heard of Dr. Henricks.

50. Rosenblatt Securities Inc. didn't pay for COBRA, at great expense to the plaintiff. According to ADP, the defendant's payroll service, the plaintiff had COBRA until January as promised until 2013. According to the defendants, ADP "screwed up" and didn't send the payments on time. According to Oxford Insurance, the defendants paid the premiums on January 7, 2012 and backdated coverage "at the client's request". The plaintiff alleges the defendants did this to further emotionally torture him, and to protect them should the plaintiff take legal action.

51. Plaintiff continued to insist the defendants investigate his "15 lbs." and provide him with the promised consulting opportunity. Defendants continued to not provide the plaintiff with clarity of types of accounts to target before insisting Mr. Wihsnow approve and edit the plaintiff's consulting projects around November 26, 2012. The plaintiff reacted strongly and the defendants accused him of being "dramatic" and "blowing himself up". Plaintiff alleges the defendants created a "false" consulting opportunity to continue to emotionally torture him and protect themselve's should the plaintiff take legal action.

52. On September 25, 2012, Rosenblatt Securities Inc. first withheld, and later tampered with plaintiff's emails rendering it impossible for him to open attachments – ie his research reports the defendants relentlessly sabotaged. Plaintiff alleges defendants did this to protect themselves against legal action. Plaintiff forwarded some emails to his Gmail account. Mr. Eric Jaso, the attorney handling the plaintiff's SEC whistleblower claim, has had the plaintiff's emails forensically analyzed at great expense, making it possible for the plaintiff to access his "forensically analyzed" attachments.

53. Rosenblatt Securities Inc. threatened plaintiff with arrest by issuing a Cease & Desist through their attorney Cesar DeCastro on February 18,2013 after plaintiff insisted the defendants investigate his "15 pounds", or allegations of unlawful and cruel harassment. Defendant's attorney, Mr. DeCastro, is a former Assistant District Attorney (ADA), and professionally acquainted with the ADA,, Robert Cannatta and officer, Detective Manstrada, assigned to enforce the defendants Cease & Desist order. Both will testify that the plaintiff was "annoyingly persistant", but never menacing.

54. In 2014, Mr. Cannatta spent several hours investigating possible criminal violations involving Dr. Henricks and Rosenblatt Securites Inc. before informing the plaintiff, "this is a civil matter". Mr. Cannatta referred him to the District Attorney's Crime Victims Unit for assistance with coping with the trauma of the experience. Plaintiff admits to being annoyingly, at times obnoxiously, persistent, but alleges the defendants filed a Cease & Desist to further discredit and deny the plaintiff access to potential witnesses.

55. The defendant alleges defendants Dr. Lorain Henricks, aka Turanski violated HIPPA privacy laws from July 2012 through January 2013 for monetary compensation, and prescribed unwarranted anti-psychotic medication, as per the request of defendant Richard Rosenblatt, in exchange for monetary compensation from defendant Rosenblatt Securities Inc., and that she and defendant Richard Rosenblatt "ganged up" on the plaintiff in an attempt to bully, pressure, and coerce the defendant into taking said medication in exchange for monetary compensation

56. The plaintiff was banned from the New York Stock Exchange (NYSE) upon being terminated in October, 2012. The plaintiff alleges Richard Rosenblatt, representing defendant Rosenblatt Securities Inc., used his influence to have the plaintiff unlawfully banned. Richard Rosenblatt is an Executive Governor of the New York Stock Exchange (NYSE) and on sits on the board of directors for the NYSE Euronext Foundation, NYSE Hearing Board, NYSE Allocation Committee, and the NYSE Designated Market Maker Broker Working Committee. The plaintiff learned of his ban after being offered a low-level job as a clerk to "help him get back on his feet" around July 5, 2013. Plaintiff was humiliated for being isolated, singled out, and wrongfully accused. The plaintiff was forced to meet with the head of security before access would be granted, and subjected to further humiliation when he was temporarily denied access for two consecutive days following. The plaintiff hasn't returned since.

57. Around the same time, Ben Phillips of defendant Integral Derivatives, strongly advised Kirk Kastburgh to not hire the plaintiff for a low-level clerking position, saying "Steve has problems", and has told many others through innuendo, rumor, and directly that the defendant is mentally unstable. And Kirk Katsburgh has been told by many others that the plaintiff "has problems". Defendant Integral Derivative has economic ties with defendant Rosenblatt Securities Inc., and personal ties to defendant Gary Wishnow. Integral Derivatives intentionally. Integral derivatives has blackballed, discredited, and helped destroy the reputation of the plaintiff; causing him severe emotional distress, further humiliation, and prevented him from making a living in his chosen career.

58. In August 2013, an acquaintance of the plaintiff, Kamran Gille, informed the plaintiff that his name has been, "trashed", and that traders from defendant Jane St. Capital, were, "crushing" him with rumor and innuendo to smear his professional reputation, implying he's mentally unstable. Jane St. Capital has a significant economic relationship with Rosenblatt Securities Inc. and has happily blackballed, discredited,

and helped destroy the reputation of the plaintiff; causing him severe emotional distress, further humiliation, and prevented him from making a living in his chosen career.

59. Defendant Gary Wishnow, beginning May 2012 and ongoing has blackballed the plaintiff, using innuendo, rumor, and malicious slander, implying and outright saying the plaintiff is mentally unstable. Defendant transgressions crossed into the plaintiff's personal and social life. The plaintiff and defendant had previously been close personal friends for greater than a decade, and shared friends and common interest. The defendant has used malicious slander, implying and outright saying the plaintiff is mentally unstable, destroying relationships and the plaintiff's personal reputation.

60. As a result of the defendant's unlawful acts, Mr. Williams has been severely damaged, and is entitled to reinstatement and recovery of twice the amount of back pay otherwise owed to him with interest; as well as compensation for litigation costs, expert witness fees, and attorneys' fees. Mr. Williams, weighing just 135 lbs., lost 10% of his body weight (15 lbs.) during the last three-months of his employment as a result of Rosenblatt Securities Inc. unlawful retaliation. Mr. Williams developed strong symptoms of Post-Traumatic-Stress (PTSD), some of which still troubles him today. Mr. Williams was hospitalized in December, 2012 as a result of his having been traumatized at work. Mr. Williams has dental damage as a result of grinding his teeth as a result of his PTSD symptoms. Mr. Williams's professional and personal reputations have been severely damaged. Mr. Williams became chronically depressed and suicidal as the result of the defendants unlawful retaliatory harassment. Mr. Williams has been financially devastated and is facing eviction from his home for having been rendered "unemployable" at any job for more than a year, and as a result of being blackballed from Wall St.

61. As described above, defendants retaliated against Mr. Williams, subjecting him to unrelenting harassment, intimidation, and humiliation and forcing a constructive discharge before terminating his employment. Defendants continued to retaliate against Mr. Williams after termination. The defendants intentionally and recklessly inflicted, and did inflict, severe emotional distress in the plaintiff with conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

62. Defendant Rosenblatt Securities Inc. violated the anti-retaliation awarded him for his protected activity in accord to the Dodd-Frank Act, (15 U.S.C.)78u-6(h) etseq.

### SECOND CLAIM FOR RELIEF

63. IIED: The defendant's 1)Rosenblatt Securities Inc., 2) Mr. Rosenblatt, 3) Mr. Gawronski, 4) Dr.Henricks, 5) Mr. Wishnow,6) Mr. Kessmsies, 7) Jane St. Capital, and 8) Integral Derivatives.  (N.Y. Civ. Rights Law 51)

### THIRD CLAIM FOR RELIEF

64. Negligent inflicted motional distress, 1) New York Stock Exchange (NYSE) (N.Y. Civ. Rights Law 51)

### THIRD CLAIM FOR RELIEF

65. Tortuous Interference with Business and Economic Advantage; 1) Integral Derivatives. (Restatement (Second) of Torts 652)

### FOURTH CLAIM FOR RELIEF

66. Tortuous Defamation by defendant's 1) Rosenblatt Securities Inc.,2) Mr. Rosenblatt, 3)Mr. Gawronski, 4)Mr. Wishnow, 5)Mr. Kessmsies, 6)Jane St. Capital, and 7)Integral Derivatives. (Restatement (Second) of Torts 652)

### FIFTH CLAIM FOR RELIEF

67. Prima Facie Tort by defendants 1)Rosenblatt Securities Inc., 2)Mr. Rosenblatt,3) Mr. Gawronski,4) Mr. Wishnow, 5)Mr. Kessmsies, 6)Dr. Henricks, 7)Jane St. Capital, and 8)Integral Derivatives.  (Restatement (Second) of Torts 652)

### SIXTH CLAIM FOR RELIEF

68. Invasion of Privacy;1) Mr. Rosenblatt, 2)Mr. Gawronski, 3)Mr. Wishnow, 4)Mr. Kessmsies,5) Jane St. Capital, and 6)Dr. Henricks. (Restatement (Second) of Torts 652)

**PRAYER FOR RELIEF**

69. Negligent Supervision, Training, and Retention; 1)New York Stock Exchange (NYSE)

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment:

70. Declaring that Defendant Rosenblatt Securities Inc.'s acts and practices complained of herein violate the Dodd-Frank Act; To be reinstated with the same seniority status that I would have had, but for Defendants' retaliatory treatment, and pay damages of two times back salary plus interest, costs, and expenses pursuant to 15 U.S. C. §78(h)(C); and the awarding such other and further relief as the Court deems just and proper.

    A. Declaring that Defendants' acts and practices complained of herein violate the Dodd-Frank Act;
    B. Directing Defendants to reinstate Mr. Williams with the same seniority status that he would have had, but for Defendants' unlawful retaliatory treatment, and pay damages of two times back-pay with interest.
    C. Awarding reasonable attorneys' fees, costs, and expenses pursuant to 15 U.S. C. §78(h)(C);
    D. Awarding such other and further relief as the Court deems just and proper.

71. Declaring has been severely injured emotionally, physically, and economically as a result of the perverse, reckless, outrageous and extreme unlawful retaliatory acts and practices complained herein violate a variety of Tort Laws; and awarding such other and further relief as the Court deems just and proper.

**Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.**

I declare under the penalty of perjury that the forgoing is true and correct.

<u>Signed this 18th day of June, 2014</u>

Respectfully submitted,

Steven A. Williams, Pro Se

510 East 6 St., Apt. C4

New York, NY, 10009

212 665-9545